IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BRIANNA L. W.,

            Plaintiff,

     vs.

FRANK BISIGNANO, Commissioner of
Social Security;

           Defendant.

8:24CV01

MEMORANDUM AND ORDER

This matter is before the Court on the Motion for an Order Reversing the Commissioner's Decision (Filing No. 15) filed by Plaintiff, Brianna W., and Motion for an Order Affirming the Commissioner's Decision (Filing No. 16) filed by Defendant, Commissioner of the Social Security Administration ("Commissioner"). Plaintiff appeals the Commissioner's final decision to deny their[1] application for Social Security Disability ("Disability") and supplemental security income ("SSI") for the period after March 12, 2020. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Filing No. 12). For the reasons stated herein, Plaintiff's Motion for an Order Reversing the Commissioner's Decision is denied, and the Commissioner's Motion for an Order Affirming the Commissioner's Decision is granted.

## BACKGROUND

### I. Procedural History

On April 24, 2020, Plaintiff filed initial applications for Title II Disability Insurance Benefits, and Title XVI Supplement Security Income. (Tr. 10). Both applications alleged disability beginning March 12, 2020, due to post traumatic stress disorder ("PTSD"). (Tr. 10). Plaintiff's applications were initially denied on November 17, 2020, and on May 5, 2022, the applications were denied on reconsideration. (Tr. 100, 166). On June 2, 2022, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 190). On November 3, 2022, a telephonic administrative hearing was held before an ALJ, where he received testimony from

---

[1] Plaintiff identifies as non-binary and prefers the use of they/them pronouns. The Court will endeavor to use Plaintiff's preferred pronouns where possible; however, some quotations from the ALJ and Plaintiff's medical records use she/her pronouns that the Court will not alter.

Plaintiff and a vocational expert. (Tr. 49-85). The ALJ issued an unfavorable decision on January 11, 2023. (Tr. 10-28).

## II.    The ALJ Hearing

Plaintiff's administrative hearing was conducted over the phone due to the circumstances created by COVID-19. (Tr. 49). Plaintiff agreed to proceed via telephone, and the ALJ received testimony from both Plaintiff and the VE. (Tr. 49-85). Plaintiff testified they have a driver's license with no restrictions but nevertheless has not driven in a month due to a fear of dissociating causing a crash. (Tr. 53, 65). Plaintiff's mother drives them places. (Tr. 65). Plaintiff has a high school education and attended one semester of college in the fall of 2021. (Tr. 53-54). Plaintiff did not continue taking college courses because their symptoms caused her to miss so much class Plaintiff fell behind on classwork and had to drop out. (Tr. 54). Plaintiff testified their life "spiraled out of control" following a traumatic event, specifically, being sexually assaulted by a friend on their birthday. (Tr. 59-60).

Plaintiff testified their social anxiety was so bad in 2017 they lost their job at Goodwill because they could not perform required job duties, an issue Plaintiff testified repeated for many other jobs. (Tr. 55-58). The ALJ reviewed Plaintiff's work history from 2022: "[y]ou were hired by, well, it's listed as DRM, August of 2022. May of '22, Entertainment Management. April of '22, Cracker Barrel. March of '22, it says TFL. February of '22, Burlington Stores. January of '22, Quick Shoppe." (Tr. 55). Plaintiff had not applied or been hired by anyone since August of 2022. (Tr. 55). Plaintiff stated that DRM was the company that owned their region of Arby's restaurants, and that she was fired from DRM due to having a "massive" panic attack. (Tr. 56). Plaintiff testified the Entertainment Management position was either Staples or the Alamo Draft House. Plaintiff testified they lost their job at Staples due to their agoraphobia and had a massive panic attack to the point where they "emotionally blacked out" on the job at the Alamo Draft House. (Tr. 57-58). (Tr. 58). Plaintiff testified that they lost their job at Quick Shoppe due to repeated "breakdowns" and was told to work elsewhere. (Tr. 58).

The ALJ inquired into what could be triggering Plaintiffs symptoms. (Tr. 58). Plaintiff responded that it was likely a combination of all of the stimulations of being in public and being told to do things while "spacing out." (Tr. 59). Plaintiff's longest employment was at Goodwill, but was unable to identify how they were able to work there for so long. (Tr. 59).

Plaintiff wants to be able to work in the future and has been motivated by emotional pressure from family and rent payments to apply for so many jobs. (Tr. 60-61). At the time of the hearing, Plaintiff lived with their parents in Nebraska. (Tr. 61). Prior to that, Plaintiff lived in Massachusetts with their best friend for about a year. (Tr. 61). Plaintiff's roommate did not have any special needs or require special care. (Tr. 61). Plaintiff's mother helped pay rent when funds were low. (Tr. 62).

The ALJ questioned Plaintiff about their interests. Plaintiff testified they used to attend social events like horror and anime conventions from 2011 to 2017, but stopped once "[their] life spiraled out of control." (Tr. 62). Plaintiff does self-taught computer design to "create things that look pretty on the internet" for a mental activity. (Tr. 63). Plaintiff does not know how to create a functioning website and has never designed a website. (Tr. 63). Plaintiff testified they do not use social media because they lost all their friends and has nobody to talk to. (Tr. 64).

The ALJ asked Plaintiff about potential jobs they may be able to perform. (Tr. 64). Plaintiff does not believe they could do housekeeping because they cannot stand for long periods of time. (Tr. 64). Plaintiff also did not believe they could work at a job where they are seated due to daily uncontrollable "amnesia episodes" preventing them from maintaining a regular schedule. (Tr. 64).

Plaintiff testified dissociative episodes cause them to feel as if they are floating from their body or cause "full-on blackouts." (Tr. 65-66). Plaintiff has experienced dissociation at work, specifically, at their positions at Quick Shoppe and as a deli clerk at Baker's grocery store. (Tr. 66-67). Plaintiff also explained their dissociative identity disorder causes them to experience "alternate state of consciousness" or "alters," which can cause self-harm behaviors. (Tr. 68-69). The alters Plaintiff experiences can be triggered by any event. (Tr. 70). Each alter is not aware of Plaintiff's age, gender, employment, or basic facts about Plaintiff. (Tr. 70). Additionally, each alter has a different mindset; for example, some alters have a mind of a six-year-old child stuck in a traumatic situation and others only come out for basic situations such as showering. (Tr. 71). Plaintiff testified that while each alter may not remember the trauma, their body remembers the trauma. (Tr. 69).

Plaintiff testified they have trauma surrounding bathrooms and getting undressed, experiencing flashbacks up to three times a day at their peak around autumn and winter holidays. (Tr. 72-73). Plaintiff showers very infrequently, sometimes going two to three weeks without

showering. (Tr. 72). Plaintiff testified they have several different triggers including Christmas music, cold weather, Christmas cookies, raising voice levels, sudden loud noises, and cigarette smoke. (Tr. 73-74). When Plaintiff experiences triggers, they freeze. (Tr. 74). For example, Plaintiff testified about an experience at a courthouse where an individual started yelling behind them, which triggered Plaintiff to have a break down. (Tr. 75). Plaintiff noted they do not remember this incident but was told it happened. (Tr. 75).

The ALJ questioned Plaintiff regarding their various healthcare providers. (Tr. 76). Plaintiff testified they were seeing Kari Fenton, MS, LIMHP ("Fenton") until April of 2022 when they could no longer afford the services. (Tr. 76). Plaintiff began seeing a psychiatric nurse practitioner, Andrew Martin, in August of 2022. (Tr. 76). Plaintiff testified they were seeing Andrea Dagner, MSW, LMHP ("Dagner") weekly for therapy. (Tr. 77). Plaintiff also sees their primary care doctor, Dr. Maen Haddadin, M.D. ("Dr. Haddadin"). (Tr. 78).

At the conclusion of Plaintiff's testimony, the ALJ posed the following hypothetical to Lisa Duke Cary, an impartial vocational expert ("VE"):

> [C]onsider an individual with [Plaintiff]'s age, education, and work experience. This individual is able to work at the light exertional level, can occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, never climb ladders, ropes or scaffolds, can tolerate occasional exposure to extreme cold, extreme heat, and atmospheric conditions, tolerate no exposure to moving mechanical parts or unprotected heights, can carry out simple instructions, cannot perform fast paced work such as assembly line work or work requiring hourly quotas, and can tolerate occasional interaction with supervisors, coworkers, and the general public.

(Tr. 80). The VE testified that this hypothetical individual could perform work as a garment sorter, DOT 222.687-014, which has approximately 54,000 jobs in the national economy; a marker, DOT 209.587-034, which has approximately 67,000 jobs in the national economy; a mail clerk non-postal, DOT 209.687-026, which has approximately 45,000 jobs in the national economy. (Tr. 81). The VE stated that the pacing limitation, the distinction in different types of climbing, and the frequency of interactions are not addressed in the DOT, but her testimony is otherwise consistent with the DOT. (Tr. 81). The portions of the VE's testimony that were not based on the DOT were based on her work experience and education with the jobs in the national economy. (Tr. 81).

The ALJ posed a second hypothetical identical to the first hypothetical, except further limiting the individual to a sedentary exertional level. (Tr. 81). The VE testified that the hypothetical individual could perform as a "document preparer, DOT code is 249.587-018, SVP

4

2, sedentary exertion, approximately 30,000 jobs in the national economy. Lens inserter, 713.687-026, SVP 2, sedentary exertion, approximately 18,000 jobs in the national economy. Final assembler, 713.687-018, SVP 2, sedentary exertion, approximately 18,000 jobs in the national economy." (Tr. 81). If the hypothetical individual could only stand and/or walk for two hours out of an eight-hour workday and sit for two hours out of an eight-hour workday, the VE testified that would preclude competitive employment. (Tr. 82). If the same hypothetical individual could only carry out simple instructions for two-thirds of the workday, the VE testified that would also preclude competitive employment. The VE added that employers may allow up to 10% of the day for off-task time, and that employers might allow "maybe one absence per month," which would also include arriving late or leaving early. (Tr. 82). The VE testified that if an individual was routinely off task a quarter of the workday or missed a couple days of the workweek, they also could not maintain competitive employment. (Tr. 83).

The VE stated that the jobs responsive to the hypothetical are not "production" or "quota" based, but there was "some" expectation of quality and quantity. (Tr. 84-85). Additionally, the VE testified that someone who had "symptoms of dissociation and inability to concentrate" may fall under hypotheticals #4 and #5 with the occasional time that the person would not be able to perform work or concentrate and be off task. (Tr. 84).

## III.    Medical Evidence

Plaintiff was seen at the Boys Town Center for Behavior Health since at least March 5, 2019. (Tr. 398). They were referred to the Behavior Health clinic by their primary care provider, Dr. Gregory Penny, "due to concerns related to longstanding emotional dysregulation." Between March 5, 2019, and November 25, 2019, Plaintiff was noted as being on time or early to all sessions except the last one on November 25, 2019. (Tr. 389-398). The therapy goals during this period were acceptance- and mindfulness-based CBT and IFS strategies to enhance emotional regulation, decrease sensitivity, and decrease instances of dissociation. (Tr. 389-398). Plaintiff's diagnoses from this period include Bipolar I Disorder, Unspecified Trauma and Stressor-Related Disorder with dissociative symptoms, Unspecified Anxiety Disorder, Hashimoto's thyroiditis, Ehlers-Danlos, fibromyalgia, and irritable bowel syndrome. (Tr. 389). Treatment notes reflect Plaintiff was usually casually dressed and nicely groomed or casually dressed with disheveled hair, and that Plaintiff actively engaged in sessions. (Tr. 388-99).

5

On July 24, 2020, Plaintiff established primary care with Adam S. Albano, MD, ("Dr. Albano") for medication refills in Massachusetts. (Tr. 509). At Plaintiff's first appointment, they reported depression, thoughts of self-harm, problems with keeping a job, moving, and the pandemic. (Tr. 509). Dr. Albano recommended behavioral services, therapy, and continued psychiatric treatment and medication. (Tr. 509-15).

On July 29, 2020, Plaintiff underwent a behavioral health diagnostic evaluation with Meghan McGrath, LICSW ("McGrath"). (Tr. 516). Plaintiff presented for an assessment noting confusion and uncertainty related to her diagnoses, and endorsing depressive, anxious, and post-traumatic symptoms. (Tr. 517). Plaintiff reported her Bipolar diagnosis but does not remember any mania. (Tr. 517). Plaintiff reported sexual abuse from a family member, emotional manipulation, bullying, and insecurities. (Tr. 517). Plaintiff stated they wanted to "get life skills to be able to function without panic attacks and being anxious all the time," and noted an interest in trauma processing. (Tr. 517). McGrath noted:

> When asked about whether someone else can control their thoughts, [Plaintiff] shared, "Yes but it's internal, like someone on the inside can control my thoughts but not me." [Plaintiff] further shared, "I hear voices but it sounds like they're coming from inside my brain, telling me things like you're doing things wrong, you're being lazy, you're being a failure but there are other ones that tell me to get up out of bed, make sure you take care of yourself and take a shower."

(Tr. 518). Plaintiff was open and engaged, with a stated mood of "kinda low, a little anxious." (Tr. 521). McGrath noted Plaintiff's strengths include "their motivation and easygoing manner," and challenges of "lifelong" history of trauma, abuse, and sexual assault. (Tr. 522). McGrath recommended that Plaintiff continue taking medications as advised, and to engage in individual therapy with a supportive therapist. (Tr. 523-24).

On August 3, 2020, Plaintiff received a psychiatric evaluation from Rebecca Match, CNP, ("Match"). (Tr. 525). Match observed Plaintiff to be well-groomed in appropriate clothing for the weather, calm and cooperative, and in a low, but not unbearable, mood. (Tr. 528). Match's recommended plan of treatment was to taper Plaintiff off Lexapro, continue Abilify and Ativan, start Prazosin for trauma related night terrors, and practice grounding techniques, with a follow up in four weeks. (Tr. 528-29). On September 3, 2020, Plaintiff followed up with Match. (Tr. 536). Plaintiff reported they were doing "a lot better actually," with increased energy, positivity, improvement in mood, and that the Prazosin has helped. (Tr. 537). Plaintiff was well-groomed,

calm and cooperative, and in a good mood. (Tr. 539). Match discontinued Lexapro, but recommended continuing all other medications and grounding techniques. (Tr. 540).

At a follow up with Match on October 2, 2020, Plaintiff reported withdrawal symptoms from discontinuing Lexapro, so Match adjusted Plaintiff's medications. (Tr. 543). Aside from withdrawal symptoms, Plaintiff's physical exam was largely normal. (Tr. 543). Plaintiff otherwise reported that since discontinuing Lexapro, their mood had significantly improved, and they felt more positive, had more energy, were sleeping well, and denied feelings of mania. (Tr. 543).

On October 17, 2020, Plaintiff underwent a psychiatric diagnostic evaluation with Samantha Street, LCSW ("Street"). (Tr. 433). Plaintiff reported "having a lot of depression symptoms and a lot of unpleasant memories that prevent me from sleeping. These things have been preventing me from doing the things that I want to do. . . . I have so much anxiety and my normal coping skills are not working for me." (Tr. 433). Street noted that Plaintiff had significant past trauma related to family, and had difficulty managing healthy family dynamics. (Tr. 433). Plaintiff's listed impairments included difficulty maintaining friendships/relationships; difficulty keeping employment; difficulty managing daily living, and unstable housing. (Tr. 433). Street noted Plaintiff wanted to understand their trauma-related symptoms better and to work towards processing that trauma by learning coping skills. (Tr. 434). Street noted Plaintiff had appropriate affect, a euthymic mood, and was interactive. Street and Plaintiff developed a plan to build coping skills, manage stressors, and achieve mental and physical health improvements. Street recommended Plaintiff follow-up with their primary care doctor about neuropsychiatric testing. (Tr. 433-36).

On October 20, 2020, Plaintiff met with Dr. Albano for a follow-up appointment for chronic pain. (Tr. 547-48). Dr. Albano referred Plaintiff to a pain clinic and recommended an increase in exercise, weight loss, Tylenol, meloxicam, and capcasin (tiger balm). (Tr. 550-51). Dr. Albano noted "a neuropathic agent may be helpful" but Plaintiff was undergoing medication adjustments with their psychiatric nurse practitioner due to their complicated mood disorder. (Tr. 551). At this visit, Plaintiff reported their mood was "ok, not bad" but endorsed ongoing depression and anxiety. (Tr. 548). At Plaintiff's follow-up with Street on October 28, 2020, Street noted anxiety and depression as active impairments with the need for continued treatment. (Tr. 438). Street noted new insights as a result of Plaintiff's treatment homework of journaling. (Tr. 437). Plaintiff noted an improvement on an anti-depressant. (Tr. 437).

7

Plaintiff continued to meet with Street from November 4, 2020, to February 2, 2021, during which time Street reported Plaintiff was able to demonstrate self-advocacy skills, deploy self-soothing strategies to redirect attention when stressed, and manage their symptoms. (Tr. 439-61). On November 24, 2020, Plaintiff reported losing their job due to panic attacks; Street noted, "Trauma-anniversaries are coming up for her and she is struggling with managing these dates." (Tr. 445). Plaintiff declined a day program for support through these anniversary dates but continued to be actively engaged in treatment. (Tr. 445). On January 20, 2021, Plaintiff reported obtaining a new position as a cashier at Cumberland Farms, but "identified anxiety around this employment and having a fear of not being able to address mental health/physical health issues in a way that can support [Plaintiff] with managing employment for a significant amount of time." (Tr. 457).

On November 2, 2020, Plaintiff had another follow-up appointment with Match. (Tr. 552). Plaintiff reported that "[they] have been better," and felt more depressed at the time. (Tr. 533). Match recorded that Plaintiff looked well-groomed, appeared their stated age, and was wearing appropriate clothing for the weather. (Tr. 555). Match prescribed Plaintiff with Cymbalta to help improve mood and discussed potential therapy options. (Tr. 556). At an appointment on December 4, 2020, Match increased Plaintiff's Cymbalta dosage. (Tr. 562). On January 5, 2021, Plaintiff was discharged from Fenway because they did not return to treatment. (Tr. 565). Soon after, Plaintiff saw Dr. Albano on January 26, 2021, for pain and appeared "vibrant and conversant and expressive." (Tr. 568).

On December 1, 2020, Plaintiff underwent a pain psychology diagnostic evaluation at the Arnold Warfield Pain Center, conducted by Raymond J. Wootton, MDIV, Ph.D. ("Dr. Wootton"). (Tr. 464). Plaintiff appeared well groomed, friendly, cooperative, alert, oriented, and engageable. (Tr. 466). Plaintiff identified physical pain, money, finding work, and mental health to be stressors. (Tr. 467). Dr. Wootton noted Plaintiff's "pain picture" may be influenced by psychological factors. (Tr. 467). Plaintiff was recommended cognitive-behavioral therapy and deep relaxation exercises to ease pain. (Tr. 467). In January 2021, Plaintiff returned for their first session of cognitive-behavioral therapy for pain medication, but then never attended another session. (Tr. 469-71).

On March 1, 2021, Plaintiff underwent an initial psychological assessment and diagnostic impression with Lauren Schenck, PLMHP PLCSW ("Schenck"). (Tr. 583). Plaintiff reported

8

having depression, anxiety, an erratic mood, suicidal thoughts, and dissociative behaviors. (Tr. 587). Plaintiff said they have online friends, enjoy horror and anime conventions, and recently moved back to Nebraska from Massachusetts. (Tr. 583). Plaintiff reported traumatic history due to several instances of sexual assault by a family member. (Tr. 584). Plaintiff set goals of managing anxiety and panic attacks, processing life, and to improving functionality as an adult. (Tr. 585). On July 19, 2021, Plaintiff was discharged by Schenk because of four no-shows, three late cancellations, and an outstanding balance. (Tr. 587). On June 24, 2021, Plaintiff returned to Dr. Albano due to medication concerns. Plaintiff reported having highs and lows but was able to cope, meet with a counselor, and felt that their regimen was working well. (Tr. 572).

In July 2021, Plaintiff began psychotherapy with Cindy Duggin, LICSW ("Duggin") after being dismissed from training at their new job at a call center due to daily panic attacks. (Tr. 589). Plaintiff hoped to get therapy for all issues, but primarily to manage panic attacks to maintain employment. (Tr. 589). Plaintiff's medical exam was normal, though they appeared anxious. (Tr. 589). Duggin believed Plaintiff needed further evaluation by a psychiatrist for bipolar and ADHD and contemplated creating a two-to-three-month treatment plan to deal with panic and generalized anxiety management at the next appointment. (Tr. 591). Plaintiff followed up with Duggin on July 26, 2021; Plaintiff reported no panic attacks though they felt anxious, and their functional status was moderately impaired. (Tr. 593). Duggin noted progress in Plaintiff's ability to learn new grounding techniques. (Tr. 593).

On October 12, 2021, Plaintiff participated in a virtual psychological consultative exam with Jasper Lawson, Ph.D. ("Dr. Lawson"). (Tr. 596). Plaintiff appeared to be casually dressed and groomed with no significant limitations, but reported issues with trauma, anxiety, depression, hyperactivity, feelings of hopelessness, dissociative episode, sleep difficulties, and difficulty managing food. (Tr. 596). When asked about daily activities, Plaintiff reported their daily activities consisted of waking up in the mid-morning, caring for their cats, driving their roommate to a job interview, running errands with their roommate, and watching television. (Tr. 597-98). Plaintiff indicated they can manage self-care activities including bathing, dressing, and shopping. (Tr. 597). Dr. Lawson noted that Plaintiff appeared to have an average cognitive ability, but may benefit from group therapy services and continued psychiatric and psychological treatment. (Tr. 598).

9

On December 21, 2021, Plaintiff began therapy with Kari Fenton, MS, LIMHP ("Fenton"). (Tr. 620). Plaintiff shared their trauma and abuse history, and both their past and current psychological and psychiatric history. (Tr. 622). Plaintiff was observed to be cooperative, engaged, and insightful, though Plaintiff appeared disheveled and anxious. (Tr. 622). Fenton noted Plaintiff's PTSD and major depressive disorder were severe and their dissociative identity disorder was moderate. (Tr. 623). Plaintiff and Fenton set goals to attend regular therapy sessions and use treatment strategies to gain greater emotional control. (Tr. 623). Plaintiff was seen by Fenton between December 21, 2021, and March 1, 2022. (Tr. 619-41). During these sessions, Fenton regularly observed Plaintiff to be anxious, disheveled, and depressed with a flat affect, although they were cooperative, engaged, and insightful. At a few appointments, Plaintiff appeared to be illogical, hopeless and lonely. Plaintiff was consistently found to have no significant risk factors regarding suicidal or homicidal ideations. During sessions, Fenton and Plaintiff focused on building coping skills, which Plaintiff understood and was willing to work towards. (Tr. 619-41).

On January 25, 2022, Plaintiff established primary care with Maen Haddadin, M.D. ("Dr. Haddadin"), and was seen for a one-month follow up visit on February 25, 2022. (Tr. 601-13). Dr. Haddadin adjusted her medications, and ordered a four to six week follow up. (Tr. 603). On May 4, 2022, Plaintiff requested a letter from Dr. Haddadin to break their apartment lease due to anxiety. (Tr. 652). Dr. Haddadin noted Plaintiff's normal mental status and found their PTSD and nightmares to be stable. (Tr. 652).

On July 18, 2022, Plaintiff was seen by Dr. Attila Roka, M.D. ("Dr. Roka") on Dr. Haddadin's referral due to recurrent syncope and palpitations. (Tr. 728). Dr. Roka recommended medical management and intensive risk factor modification, and a follow up with the sleep clinic. (Tr. 731-32). Dr. Roka emphasized the importance of weight loss. (Tr. 732).

On July 26, 2022, Plaintiff underwent a biopsychosocial assessment with Andrea Dagner, MSW, LMHP ("Dagner") to seek therapy "due to memeories (sic) of the past impairing her from living a regular life." (Tr. 712). During this assessment, Plaintiff relayed past trauma and abuse, and shared they were experiencing dissociative episodes, anxiety, depression., PTSD, and panic attacks when leaving the house. (Tr. 712). Plaintiff reported enjoying listening to music, journaling, writing fan fiction, and role playing with friends on an instant messaging and social media platform. (Tr. 713). Plaintiff was seen by Dagner from July 26, 2022, to November 6, 2022, to discuss current issues, past traumas, and coping strategies. (Tr. 712-27). Plaintiff was

10

encouraged to journal their feelings and thoughts, especially when stressed. (Tr. 725). Although Plaintiff was still experiencing dissociative behaviors, Plaintiff expressed they are okay with driving, are interested in exercising with their mother, and have been computer coding and creating their own website. (Tr. 726). At Plaintiff's appointment on September 20, 2022, Plaintiff reported their medication seemed to be working but was struggling with sleep, possibly due to sleep apnea. (Tr. 726).

On August 29,2022, Plaintiff began seeing Andrew Martin ("Martin"), a psychiatric nurse practitioner. (Tr. 687). Plaintiff's chief complaint was that their medications were not right. (Tr. 687). Plaintiff reported difficulty in staying asleep, mood changes, problems with thinking or concentrating, and anger. (Tr. 709). Martin observed Plaintiff to speak with an appropriate tone, was coherent, logical, and appropriate, well oriented, had good memory, judgment, insight, appropriate mood and affect, appropriate appearance and grooming, and smooth gait with no abnormal movement though was easily distracted. (Tr. 697-700).

## IV.    Opinion Evidence and Evaluations

A social security medical consultant ("MC"), John Jao, provided a Residual Functional Capacity Assessment. (Tr. 642). The MC determined that Plaintiff was able to occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk for about six hours in an eight-hour workday; sit for a total of six hours in an eight hour workday; and was unlimited in their ability to push and pull. (Tr. 643). The MC noted Plaintiff could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but only occasionally climb ladders, ropes, and scaffolds. (Tr. 644). The MC noted Plaintiff had no manipulative limitations, visual limitations, or communicative limitations. (Tr. 645-46). Plaintiff's only environmental limitation was to avoid concentrated exposure to fumes, odors, dusts, gases, and areas with poor ventilation. (Tr. 646).

Kari Fenton authored a letter to give the Social Security Administration information regarding Plaintiff's mental health status. (Tr. 614). Fenton stated Plaintiff was "diagnosed with Major Depressive Disorder, recurrent, Posttraumatic Stress Disorder, Chronic, and Dissociative Identity Disorder . . . in December of 2021," and that Plaintiff's mental impairments were first documented at age twelve in 2009. (Tr. 614). Fenton noted Plaintiff's symptoms started at an early age and only increased over time. (Tr. 614). Fenton stated Plaintiff's impairments have become clearer over the course of therapy because their "thought processes have exemplified the

11

following: more frequent illogical thinking patterns, suicidal ideations, episodes of decompensation, a sense of worthlessness, and a limited ability to adapt and manage [them]self." (Tr. 614). Fenton provided references to several statements Plaintiff made during examinations, including losing track of time and blanking out, and stating that "at times [they] do not feel real." (Tr. 614). Fenton determined that Plaintiff meets the criteria listed in the Social Security Blue Book, section 12.15 Trauma-and stressor-related disorders. (Tr. 615). Fenton observed that Plaintiff also meets the criteria listed in the Social Security Blue Book, section 12.04 for Depressive, bipolar, and related disorders. (Tr. 615). Fenton found Plaintiff to have several specified functional impairments including hallucinations, loss of concentration, inability to complete goal-oriented tasks, and a constant sense of hopelessness and worthlessness. (Tr. 616). Fenton determined and opined that Plaintiff was "unable to resume any type of gainful employment due to mental impairments" and will "see a continued decline in function over time as the prognosis is poor." (Tr. 617).

## I.     The ALJ's Decision

The ALJ evaluated Plaintiff's claim using the "five-step" sequential analysis prescribed by the Social Security Regulations.[2]  See 20 C.F.R. §§ 404.1520(a) and 416.920(a). The ALJ found Plaintiff met the insured status requirements of the Social Security Act through June 30, 2022, and

---

[2] The Social Security Administration uses a five-step process to determine whether a claimant is disabled:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the RFC to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

https://www.westlaw.com/Document/If8b62fa3610d11dbb29ecfd71e79cb92/View/FullText.html ?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0&fragmentIdentifier=c o_pp_sp_506_894*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)).

they had not engaged in substantial gainful activity since the onset date of March 12, 2020.  (Tr. 13).  The ALJ stated Plaintiff had "worked intermittently since the alleged onset date, earning anywhere from $4 to $596 from short stints with employers, though her total wages have never met the minimum threshold for substantial gainful activity."  (Tr. 13).  The ALJ found that Plaintiff had the following severe impairments: PTSD with dissociative symptoms, major depressive disorder, generalized anxiety disorder, bipolar disorder, attention deficit-hyperactivity disorder ("ADHD"), and obesity, and found that these conditions significantly limit Plaintiff's ability to perform basic work activities.  (Tr. 13).  The ALJ noted several other impairments including hypothyroidism, hypertension, hyperlipidemia, and asthma, but found that since these were all either well managed with medications or no longer required on-going treatment, they were non-severe.  (Tr. 13).  The ALJ noted that Plaintiff reported fatigue, dizziness, lightheadedness, flushing, and palpitations that were caused by a tachycardia, but those symptoms were solved by a medication adjustment, "and as such, tachycardia found on exam is found to be a non-severe impairment."  (Tr. 13).  The ALJ then found that a number of other asserted diagnoses were not medically determinable, including fibromyalgia, chronic pain syndrome, postural orthostatic tachycardia syndrome ("POTS"), polycystic ovary syndrome ("PCOS"), and panic disorder.  (Tr. 15).

The ALJ next determined that none of the severe impairments alone or in combination met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15).  The ALJ recognized that obesity is no longer a listed impairment but can still have an impact on body systems, so the ALJ considered obesity in combination with any other impairments when determining Plaintiff's residual functioning capacity ("RFC").[3]  (Tr. 15).  The ALJ stated that Plaintiff's psychological symptoms and their effect on functioning have been considered together, regardless of the precise etiology or diagnostic label.  (Tr. 16).  The ALJ found a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; no more than a moderate limitation in concentrating,

---

[3] "'Residual functional capacity' is 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" https://www.westlaw.com/Document/If8b62fa3610d11dbb29ecfd71e79cb92/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=da3.0&fragmentIdentifier=co_pp_sp_506_894*Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

persisting, or maintaining pace; and no more than a moderate limitation in adapting or managing themselves. (Tr. 16-17). The ALJ then determined that Plaintiff's mental impairments did not satisfy the presence of paragraph C criteria of the applicable mental disorder listings showing that Plaintiff's mental disorder is "serious and persistent" meaning Plaintiff has "a medically documented history of the existence of the disorder over a period of at least 2 years" because the evidence failed to establish repeated episodes of decompensation, that Plaintiff's mental disorders would have resulted in such marginal adjustment that even a minimal increase in mental demands would cause decompensation, and because Plaintiff's medical records do not show Plaintiff required a highly supportive living arrangement to maintain limited amounts of functioning. (Tr. 17).

The ALJ then found that Plaintiff had the capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with certain limitations. (Tr. 18). After consideration of the entire record, the ALJ found Plaintiff had the RFC to

> occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs though never climb ladders, ropes, and scaffolds. [They] can tolerate occasional exposure to extreme cold, extreme heat, and atmospheric conditions though no exposure to moving mechanical parts or unprotected heights. [They] can carry out simple instructions and tolerate occasional interaction with supervisors, coworkers, and the general public though [they] cannot perform fast-paced work such as assembly line work or work requiring hourly quotas.

(Tr. 18). The ALJ did not defer or give specific evidentiary weight to medical opinions of findings in determining Plaintiff's RFC. (Tr. 25). The ALJ made this finding by relying on all of Plaintiff's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence. (Tr. 18). The ALJ analyzed Plaintiff's alleged symptoms using their testimony coupled with medical records from psychological and psychiatric treatment, primary care providers, psychotherapy, a psychological consultative exam, therapists, a biopsychosocial assessment, and a diagnostic evaluation from a licensed clinical social worker. (Tr. 19-23). The ALJ determined that Plaintiff's obesity and asthma limits them to light exertional work where "[they] can occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs though never climb ladders, ropes, and scaffolds." (Tr. 24). The ALJ made a point to state:

> In reaching these conclusions, the undersigned is mindful that the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with eh (sic) greater record. For example, she testified that her anxiety, panic attacks, and dissociative states have caused her to lose jobs and make it difficult for her to leave her home. Yet, none of her providers have noted

such significant anxiety that she was unable to share her own personal, mental
health, or medical history or submit to care.

(Tr. 24) (citations omitted). The ALJ noted that Plaintiff was able to leave their home throughout
the relevant period to shop for groceries, work, give her roommate rides, attend medical
consultations, socialize, and even pursue opportunities to exercise. (Tr. 24).

Regarding Plaintiff's physical impairments, the ALJ stated that they were consistently
observed with normal gait and station and that none of their providers noted any concerns about
shortness of breath or inability to move about exam rooms and clinic spaces. (Tr. 24). "[Their]
physical exams have not prompted her medical providers to seek out any kind of imaging aside
from the mild findings found in November 2020." (Tr. 25).

The ALJ determined the psychological examiners at the State disability determination
services findings of mild to moderate mental limitations to be "generally persuasive as they are
supported by their own analyses, particularly that she has been able to drive, attend her own
appointments, care for her cats, and run errands, and presented greater complaints at the
psychological consultative exam than was present in the longitudinal notes." (Tr. 25). The ALJ
found this to be consistent with most mental status exams in the medical evidence "where she was
presenting logical, coherent thoughts free of delusions and abnormal psychomotor activity, if
somewhat anxious at times, and also consistent with the lack of observations of any kind of panic
attacks or dissociative episodes, even when she is discussing her mental health and trauma
history." (Tr. 25). The ALJ found that she has moderate limitations in interacting with others and
adapting and managing herself, though the examiners found mild limitations. (Tr. 25). The ALJ
found the psychological consultative examiner's lack of asserting significant mental limitations to
be persuasive because they were supported by his observations on the exam and were largely
consistent with most mental status exams in the medical evidence and the lack of observations of
panic attacks or dissociative episodes. (Tr. 25).

The ALJ found the physical examiners at the State disability determination services
opinions to be persuasive, except for the attribution of symptoms to fibromyalgia. "The physical
examiners at the State disability determination services opined that [Plaintiff] has severe
impairments related to obesity and fibromyalgia and limited her to light exertional work with
additional postural and environmental limitations." (Tr. 25). The ALJ determined that these
findings were supported by the examiner's analyses since Plaintiff was "able to drive her
roommates to appointments, care for cats, run errands, prepare simple meals, and engage in various

15

leisure activities." (Tr. 26).  The ALJ found that these opinions were consistent with the physical exams that showed "no difficulties with her ability to move about the exam rooms or clinical spaces and the minor findings in her imaging." (Tr. 26).  The ALJ did not find fibromyalgia to be a medically determinable impairment but stated that Plaintiff's pain is accommodated by the limitations in the RFC.  (Tr. 26).

The ALJ found medical consultant Jao's opinion that Plaintiff is capable of light exertional work though not imposed environmental limitations and fewer postural limitations to be less persuasive "because the claimant's obesity suggests more restrictions, and though her asthma may be a nonsevere impairment, environmental limitations are appropriate to ensure that breathing difficulties are not exacerbated." (Tr. 26).  The ALJ determined that they were supported by his analysis that Plaintiff was treated with medications to treat their mental symptoms and pain, but otherwise her physical exams did not reveal significant mobility limitations.  (Tr. 26).  The ALJ stated the opinion was "consistent with the physical exams that showed no difficulties with the ability to move about the exam rooms or clinical spaces, the minor findings in her imaging, her ability to drive, and her interest in beginning to exercise again." (Tr. 26).

The ALJ found Fenton's opinion that Plaintiff meets mental listings as "statements being neither valuable nor persuasive," and not opinions under the current rules.  (Tr. 26).  "[T]his requires no further analysis of those statements." (Tr. 26).  The ALJ found Fenton's other findings to be unpersuasive because the opinion is primarily based on Plaintiff's self-reported limitations:.

> Ms. Fenton's own treatment notes do not support these conclusions, which at no point mention any responses to internal stimuli.  They are also inconsistent with the claimant's activities of daily living, particularly attending horror anime conventions, designing apps and websites, online dating, socializing with friends, and spending her leisure time reading, writing, and watching television without apparent difficulties.

(Tr. 26).  The ALJ found these opinions to also be inconsistent with evidence that Plaintiff continued to live independently without needing specialized services.  (Tr. 26).  The ALJ stated other providers never reported observing responses to internal stimuli or difficulties with logical thought processes and psychomotor abnormalities, "let alone significantly impaired insight and judgment." (Tr. 26).

The ALJ found that Plaintiff had no past relevant work, so transferability of job skills was not an issue.  (Tr. 27).  The ALJ stated Plaintiff was born on July 19, 1997, was 22 years old on

16

the alleged onset date, and had at least a high school education. (Tr. 27). Then the ALJ considered Plaintiff's RFC, age, education, and work experience to determine that there are jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. 27). The ALJ relied on the VE's testimony when making this determination. (Tr. 27).

The VE testified that a hypothetical individual with Plaintiff's age, education, work-experience, and RFC could perform the requirements of document preparer (DOT 249.587-018), lens inserter (DOT 713.687-026), or final assembler (DOT 713.687-018). (Tr. 27-28). The ALJ concluded Plaintiff can make a successful adjustment to other work which exists in significant numbers in the national economy. The ALJ therefore found Plaintiff was not disabled from March 12, 2020, through the date of the decision. (Tr. 28).

On March 16, 2023, Plaintiff the filed an Appeal with the Social Security Administrations Appeals Counsel, who rejected Plaintiff's request on October 30, 2023. (Tr. 1, 254). Plaintiff timely filed this action for review of the ALJ's decision on January 2, 2024. (Filing No. 1). Plaintiff filed a Motion for an Order Reversing the Commissioner's Decision on April 5, 2024, and the Social Security Commissioner filed a Motion for an Order Affirming the Commissioner's Decision on May 6, 2024. (Filing No. 15; Filing No. 16). Plaintiff contends reversal is required because (1) the ALJ's RFC is not supported by substantial evidence in the record as it does not account for all of Plaintiff's medically determinable impairments, and is based on an "impermissibly superficial analysis of SSR 96-8P"; and (2) the ALJ improperly focused on the need for objective evidence, disregarded Plaintiff's subjective complaints, and misstated Plaintiff's testimony when determining the severity and limiting effects of Plaintiff's conditions. (Filing No. 15-1 at p. 1).

## STANDARD OF REVIEW

After a claimant has sought review of an ALJ's decision by the Appeals Council, the claimant is entitled to judicial review of the ALJ's decision in federal district court. *Smith v. Berryhill*, 587 U.S. 471, 475 (2019); 42 U.S.C. § 405(g). When reviewing the Commissioner's decision, this Court determines whether the Commissioner's decision complies with relevant legal requirements or "whether substantial evidence on the record as a whole supports the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). "Legal error may be an error of procedure, the use of erroneous legal

standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). "The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "more than a mere scintilla," and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under the substantial evidence standard, the district court will consider "evidence that detracts from the [ALJ's] decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (citing *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)). However, the district court will not reverse an ALJ's decision "simply because some evidence supports a conclusion other than that reached by the [ALJ]." *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). This Court must also affirm the ALJ's decision "[i]f, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)). "It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." *Dols*, 931 F.3d at 746 (8th Cir. 2019) (quoting *Cox v. Astrue*, 495 F.3d 614,617 (8th Cir. 2007)). Nevertheless, the Court's review is "more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (internal citations omitted). The Commission's decision should only be disturbed "if it falls outside the available zone of choice." *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022) (quotation omitted).

## ANALYSIS

### I.   Substantial Evidence Supports the ALJ's RFC Determination.

Plaintiff first argues that reversal is required because the ALJ's RFC is not supported by substantial evidence in the record. Specifically, Plaintiff argues the ALJ did not base Plaintiff's RFC on all the relevant evidence contained in the record, did not account for all the Plaintiff's

medically determinable impairments, and that the RFC determination is based on an impermissibly superficial analysis of Social Security Ruling ("SSR") 96-8p.

> a. *The ALJ's Assessment of RFC is Based on All Relevant Evidence Contained in the Record and Properly Considers All of Plaintiff's Medically Determinable Impairments.*

"The ALJ's RFC assessment must be based on 'all the relevant evidence in [the] case record. Even 'non-severe' impairments must be considered in the RFC." *Igo v. Colvin*, 839 F.3d 724, 730 (8th Cir. 2016) (quoting 20 C.F.R. § 404.1545(a) and *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  This includes "the medical records, observations of treating physicians and others, and an individual's own description of [their] limitations." *Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022) (quoting *Hensley v. Colvin*, 829 F.3d 926, 931-32 (8th Cir. 2016) (citation omitted)).  This Court must determine "whether substantial evidence on the record as a whole supports the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhuag v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009); *see also* 42 U.S.C. § 405(g).  This Court "reviews the record to ensure that an ALJ does not disregard evidence or ignore potential limitations but [does] not require an ALJ to mechanically list and reject every possible limitation." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090-91 (8th Cir. 2018).  "An ALJ's assessment must be supported by *some* medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (emphasis added).  More simply, ALJ's are not required to make explicit findings for every aspect of a claimant's RFC. *Joseph v. Colvin*, No. 8:12-CV-146, 2013 WL 1788570 (D. Neb. Apr. 26, 2013).

Plaintiff's argument suggests the ALJ must take a function-by-function approach when analyzing the RFC; however, it is not the role of this Court to require an ALJ to mechanically list and reject every possible limitation.  *Nash*, 907 F.3d at 1091.  Here, the ALJ concluded that Plaintiff's statements about the intensity, persistence, and limiting effects of their symptoms are "not entirely consistent with the greater record."  (TR. 26).  In making his determination, the ALJ considered all evidence, including medical evidence submitted less than five days before the scheduled hearing.  (TR 10, 18-26).  The ALJ's determination was based on medical evidence that Plaintiff had abilities to perform work consistent with the vocational expert's testimony, and that medical records demonstrated Plaintiff could understand and carry-out simple instructions, respond appropriately to superiors and co-workers, and deal with change.  Plaintiff demonstrated

they could understand and carry out instructions when they followed their medical doctors' plans, (TR. 712-27), and by following instructions on how to code a website. (TR. 725).

Plaintiff provides an alternative assessment of the same evidence considered by the ALJ, but Plaintiff's subjective statements are not enough to satisfy their burden. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone by conclusive evidence of disability."). This Court's review is limited to whether substantial evidence is contained in the record to support the ALJ's determination. The presence of contrary evidence does not imply error by the ALJ. *See Biestek v. Berryhill*, 587 U.S. 97, 107 (2019) (determining that the refusal to disclose supporting data can prevent a court accepting an expert's testimony in some cases, but not in others).

### b. The ALJ's Determination is not Based on a "Superficial" Analysis of SSR 96-8p.

Next, Plaintiff argues that the ALJ's RFC determination is based on a superficial analysis of SSR 96-9P. (Filing No. 15-1 at p. 8). SSR 96-9P provides guidance regarding the ALJ's duty to assess and explain the evidence underlying their RFC finding, providing in relevant part, "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8P, 1996 WL 374184 (July 2, 1996). Plaintiff's argument ignores the substantial evidence in the record which supports the ALJ's SSR96-9P analysis. Substantial evidence supports that Plaintiff can understand and carry out simple instructions. In responding appropriately to medical professionals, Plaintiff was never observed to respond in a rude manner or have dissociative breakdowns at her numerous appointments. Most significantly, the record sufficiently establishes Plaintiff can deal with change. Plaintiff switched medical providers several times over the period at issue. Plaintiff faced adversity and change when they moved to Massachusetts and back to Nebraska. Looking at Plaintiff's day-to-day life, Plaintiff admitted to driving their roommate to appointments and interviews. Evidence supports that Plaintiff was able to adapt to changes that driving presents including traffic lights changing, other cars suddenly braking, or weather. As such, the ALJ properly considered the evidence in analyzing Plaintiff's four broad areas of mental functioning.

## II.   The ALJ Properly Considered Plaintiff's Subjective Complaints.

Next, Plaintiff argues the ALJ disregarded their "consistent subjective complaints and testimony that indicate an inability to sustain any type of employment attendance" and asserts the ALJ made "very few references to the Plaintiff's testimony." (Filing No. 15-1 at pp. 13-14).  After review, the Court concludes the ALJ did not improperly focus on objective evidence or disregard Plaintiff's subjective complaints and properly considered Plaintiff's testimony regarding their symptoms and physical limitations, medical evidence and records of their alleged disabilities, and medical opinions.  (TR. 25-26).

When determining a claimant's RFC, an ALJ must take into account the claimant's symptoms and evaluate the intensity, persistence, and limiting effects of those symptoms. See Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Mar. 16, 2016); see also Bryant v. Colvin, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the RFC determination includes an assessment of the claimant's credibility regarding subjective complaints."). "The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole." Koch v. Kijakazi, 4 F.4th 656, 664 (8th Cir. 2021) (quoting Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)).  But "an ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them." Id. (quoting Wiese v. Astrue, 552 F.3d 728, 733 (8th Cir. 2009)).  An ALJ:

> must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record , and observations by third parties and treating and examining physicians relating to such matters as: (1) claimant's daily activities; (2) duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ also considers whether there are inconsistencies between the claimant's statements and the rest of the medical evidence, only accepting those statements that can "reasonably be accepted as consistent" with the rest of the record in making its RFC determination. 20 C.F.R. § 416.929(c)(4). "Credibility determinations are the province of the ALJ, and as long as 'good reasons and substantial evidence' support the ALJ's evaluation of credibility," the court will normally defer to the ALJ's credibility determination. Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (citing Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)).  "An ALJ may decline to credit a claimant's subjective

complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the court] will normally defer to the ALJ's credibility determination." *Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (citing *Halversen v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010)).

The Court finds substantial evidence supports the ALJ's decision to discount Plaintiff's subjective complaints when formulating their RFC.  The ALJ clearly pointed out inconsistencies established by the evidence in the record.  For example, Plaintiff testified they have dissociative identity disorder where they experience different "alters" based on different circumstances and triggers.  (Tr. 68).  However, only one medical provider formally diagnosed Plaintiff with dissociative identity disorder at a moderate severity.  (Tr. 623).  All other medical providers diagnosed Plaintiff with PTSD with some dissociation symptoms, anxiety, bipolar disorder, or depression.  (Tr. 509-15, 516-24, 525-29, 536-41, 596-98).  No medical providers, including Ms. Fenton, reported that Plaintiff showed any signs or symptoms of dissociative behavior during appointments or examinations.  The only evidence of dissociation is Plaintiff's own testimony and reports.  Further, Plaintiff's admissions indicate that prescription medications, such as Prazosin, were successful and helped relieve symptoms.  Plaintiff reported doing 'a lot better actually,' with increased energy, positivity, and significant improvement in mood due to the Prazosin.  (Tr. 537); *see Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").  Considering the evidence, when Plaintiff took medication, it was effective and allowed Plaintiff to function.

Another inconsistency exists regarding Plaintiff's inability to sustain employment due to mental breakdowns.  Plaintiff testified their symptoms held them back from fully performing work and were reasons for being fired.  (Tr. 56-61).  Contrary to that testimony, Plaintiff's medical providers frequently documented that Plaintiff had a normal mental status that was controlled with medicine.  Several times, Plaintiff reported they felt the medicine and therapy were working.  (Tr. 439-61, 536-41, 571-75, 712-27).  During consultations, medical professionals never reported Plaintiff to have heightened anxiety, instances of dissociative behavior or emergency psychiatric care.  Medical records demonstrate that Plaintiff had appropriate thought processes and could explain how they were feeling.

22

Other evidence strengthens the assertion that Plaintiff can perform consistent activities. Plaintiff was able to feed their cats, (Tr. 597), and was able to dog sit for their parent's new puppy, (Tr. 721). Plaintiff was also able to design websites and was learning how to code websites for aesthetics. (Tr. 725). The ALJ correctly considered that these activities negate Plaintiff's position they cannot focus or perform a job without facing mental issues. Plaintiff's subjective complaints and testimony are in direct conflict with the objective evidence in the record. Considering the factors set out in *Polaski*, the ALJ explicitly discredited Plaintiff's ability to perform work and provided significant evidence for doing so.

Additionally, Plaintiff testified they could not drive due to their symptoms and had their mother drive them everywhere. (Tr. 65). The only time Plaintiff asserted they could not drive was in their testimony, (Tr. 56), but medical records and Plaintiff's statements therein demonstrate their symptoms did not prevent them from driving. Plaintiff moved to Massachusetts by themselves. Plaintiff admitted they could leave their home when necessary, including to get groceries, go to medical appointments, and give roommates a ride. (Tr. 24). The record establishes only two occasions when Plaintiff's parents provided Plaintiff transportation due to symptoms. (Tr. 75).

Plaintiff also provided conflicting testimony regarding their daily activities. Plaintiff testified they went to community college in 2021 for web design but failed and dropped out due to lack of motivation to go to school. Despite dropping out, Plaintiff never stopped designing websites. Plaintiff consistently reported to medical providers they enjoyed designing websites and found it to be a mental activity. (Tr. 63).

Plaintiff stated they used to enjoy horror and anime conventions but that they no longer go to these events due to their symptoms. Plaintiff testified about the anxiety and dissociation they experienced which prohibited them from attending these events in 2017 and beyond. However, Plaintiff's medical records from 2022 indicate that Plaintiff reported enjoying horror and anime conventions, which is after the alleged onset of disability. (Tr. 583). Plaintiff consistently claimed to have no friends yet also admitted to participating in activities with online friends and even lived with their friend in Massachusetts for a period of time. (Tr. 583, 713).

Plaintiff testified their hygiene is poor and they lack motivation to get ready and shower. However, medical records consistently reflect Plaintiff was appropriately dressed and groomed for appointments. See e.g., Tr. 464-69, 525-29, 596-98. While some medical records document Plaintiff had disheveled hair at times, this Court will not reverse an ALJ's decision simply because

23

there is some evidence which could support a decision other than that of the ALJ.  See *Fentress,* *854 F.3d at 1020*.  Additionally, the reports that Plaintiff was appropriately dressed and groomed is overwhelming in comparison to Plaintiff being disheveled.

While Plaintiff does not specifically assign as error the ALJ's conclusions regarding their physical limitations, it is worth mentioning further discrepancies between Plaintiff's testimony and objective medical records, which further supports the ALJ's decision to discredit Plaintiff's subjective complaints as to her mental limitations.  The ALJ discussed objective medical evidence in detail that undermined Plaintiff's subjective complaints of physical disability.  Plaintiff alleged they were physically limited from performing work.  (Tr. 16).  However, Plaintiff has consistently been observed with normal gait and station.  (Tr. 687-709).  No providers have noted concerns about shortness of breath or inability to move.  In fact, Plaintiff acknowledged seeking out opportunities for exercise.  (Tr. 726).

Additionally, the Court disagrees with Plaintiff's assertion that the ALJ misstated Plaintiff's testimony when determining the severity and limiting effects of Plaintiff's condition because Plaintiff presented conflicting testimony throughout the hearing, specifically about their engagement in daily activities.  Substantial evidence exists when ALJ's observation of reported daily activities were inconsistent with self-reported limitations. See *Steed v. Astrue,* *524 F.3d 872,* *876 (8th Cir. 2008)*.  In considering Plaintiff's daily activities, the ALJ found that Plaintiff's daily activities were not as restricted as one would expect, given their complaints of disabling limitations.  (Tr. 26).

Under the substantial evidence standard of review, Plaintiff failed to prove that no reasonable factfinder could have reached the ALJ's conclusions on the record.  Due to inconsistencies between medical records and Plaintiff testimony, the ALJ properly analyzed Plaintiff's subjective complaints, and explained discrepancies in the record to discredit Plaintiff's testimony. This Court will defer to the ALJ's credibility determination and finds the ALJ did not commit reversible error because substantial evidence supports the ALJ's RFC determination.  *See* *Halverson v. Astrue,* 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Juszczyk v. Astrue,* 542 F.3d 626, 632 (8th Cir. 2008)) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination").  It is clear from the record and testimony that the ALJ gave good reason for discrediting testimony by pointing to specific objective evidence to support his findings and assertions and to counter

24

Plaintiff's subjective complaints.  As such, this Court will defer to the ALJ's credibility determination and finds there was substantial evidence used when analyzing Plaintiff's RFC.

### III.  The ALJ properly analyzed and fully considered the medical opinions.

Lastly, Plaintiff argues the ALJ improperly disregarded their treating mental health provider's opinion that Plaintiff's "symptoms rise to the level of the bluebook listings" after concluding, without the support of substantial evidence, that "the claimant's psychological symptoms have been well-controlled with therapy and psychiatric medication, and medical providers have observed generally normal mental status examinations." (Filing No. 15-1 at p. 14).

An ALJ does not assign specific evidentiary weight to any medical opinion and does not defer to the opinion of any medical source, including medical providers.  See *Bowers v. Kijakazi,* 40 F.4th 872, 875 (8th Cir. 2022) (citing 20 C.F.R. § 404.1520c(a)) ("Under the current regulations, however, treating physicians are not entitled to special deference.").

> The revised regulations direct ALJs to consider five factors when evaluating the persuasiveness of a provider's medical opinion: (1) whether it is supported by objective medical evidence and the provider's own explanations, (2) whether it is consistent with other evidence in the record, (3) the relationship the provider has with the claimant, (4) the provider's specialization, and (5) any other relevant factors.

*Cropper v. Dudek*, 136 F.4th 809, 813 (8th Cir. 2025) (citing 20 C.F.R. § 404.1520c(c)(1)-(5)). "Supportability and consistency are the most important factors."  *Id.* (citing § 404.1520c(a)).  An ALJ is not required to explain how he or she considered the remaining factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  Regarding consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  If a single medical source provides multiple medical opinions, the ALJ can address all the source's opinions "together in a single analysis."  20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).

This Court's review is limited "to whether the ALJ adequately analyzed persuasiveness, including the supportability and consistency factors, not whether [this Court] agree[s] with the

ALJ's evaluation of the record evidence on those issues." *Cropper*, 136 F.4th at 814 (citing *Austin v. Kijakazi*, 52 F.4th 723, 728–30 (8th Cir. 2022); *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022)). This includes determining "whether the ALJ's reasoning is 'clear enough to allow for appropriate judicial review.'" *Id.* (quoting *Grindley v. Kijakazi*, 9 F.4th 622, 631 (8th Cir. 2021)).

Plaintiff asserts the ALJ did not properly consider Plaintiff's treating mental health provider, Kari Fenton's, opinion. (Filing No. 15-1 at pp. 12-15). The ALJ analyzed and fully reviewed the medical opinions, articulating why each opinion was supportable and whether they were consistent with other evidence. (Tr. 25). Clearly, there are many inconsistencies between the record and Plaintiff's testimony. When the ALJ evaluated the record, he properly gave weight to acceptable clinical and laboratory diagnostic techniques which presented different results that were inconsistent with the medical opinion. In fact, all medical records, including Fenton's own medical records, were inconsistent with her opinion that Plaintiff observed loosening of associations and illogical thinking. For example, Fenton observed Plaintiff to be engaged and insightful for seven of the nine sessions. (Tr. 624, 626, 632, 634, 636, 638, 640). Fenton observed Plaintiff to be illogical with labile affect only two of the nine sessions, though Fenton noted Plaintiff was responsive to interventions. (Tr. 628, 630). As such, the ALJ correctly did not give the opinion controlling weight because of the clear inconsistencies. The Court therefore finds that the ALJ did not err when analyzing the medical opinions.

For the foregoing reasons, the Court concludes substantial evidence supports the ALJ's RFC, the ALJ's decision was not based on an impermissible analysis of SSR 96-8p, and that the ALJ properly considered all the evidence in formulating Plaintiffs RFC. Therefore, the ALJ did not commit reversible error relying on objective evidence and analyzing the record as a whole. After careful consideration of the record and each argument presented, the Court finds that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law. Upon consideration,

**IT IS ORDERED:**

1. Defendant's Motion for an Order Affirming the Commissioner's Decision (Filing No. 16) is granted;

2. Plaintiff's Motion for Order Reversing the Commissioner's Decision (Filing No. 15) is denied; and

3. A separate judgment will be entered.

26

Dated this 23rd day of September, 2025.

BY THE COURT:

s/Michael D. Nelson
Unites States Magistrate Judge